# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-2798

_____

ROGER DALE RAULERSON,

    Petitioner,

    v.

STATE OF FLORIDA,

    Respondent.

_____

Petition for Writ of Prohibition—Original Jurisdiction.
Phillip A. Pena, Judge.

April 30, 2025

ROWE, J.

Roger Dale Raulerson petitions for a writ of prohibition, following the circuit court's order denying his motion to dismiss. Raulerson claimed immunity from criminal prosecution under section 776.032(1), Florida Statutes (2019), asserting that he was acting in self-defense and also seeking to prevent escape while making a citizen's arrest when he twice shot into the victims' car. We deny the petition.

*Facts*

Based on events that occurred on May 3, 2020, the State charged Raulerson with (1) aggravated battery with a deadly weapon, (2) shooting or throwing a deadly missile into an occupied

vehicle, (3) aggravated assault with a deadly weapon, and (4) criminal mischief. Raulerson moved to dismiss counts one, two, and four, asserting self-defense immunity under section 776.032(1). He claimed that he was immune from prosecution because he was making a citizen's arrest, the victims resisted him, and were trying to prevent escape, and, in the alternative, because he reasonably believed that using deadly force was necessary to prevent imminent death or great bodily harm to himself under section 776.012(2), Florida Statutes.

At the evidentiary hearing, the State and defense counsel presented testimony from the victims, the defendant, eyewitnesses, police officers, and experts. The facts below were developed from this testimony.

In April 2020, the victims (Husband and Wife), who had been married for over twenty-seven years, had recently moved in with Husband's half-brother, Richard Hunt. Hunt inherited a portion of the home and land located on North Raulerson Road when his mother died. Husband also inherited a portion of the home now jointly owned with his stepfather and siblings. Raulerson lived in a home about one hundred yards down from and across the road from Hunt.

On the morning of the shooting, Husband and Wife drove to Dollar General to buy groceries to make breakfast. When they arrived back at Hunt's house, the couple realized they had forgotten a few items, and they began to argue. They drove back to the store, arguing on the way there and back.

Raulerson claimed that from his home down the road, he saw the couple driving to and from the store. He asserted that Husband and Wife drove separate cars. Raulerson maintained that the two raced up and down the road and tried to run each other off the road. Raulerson reported what he saw to the Baker County Sheriff. The Sheriff directed Lt. James Marker to contact Raulerson about the complaint.

Husband and Wife refuted Raulerson's version of the story about their driving. Wife explained that after she and Husband discovered they needed to return to the store for the items they

forgot to buy, they were arguing and decided to drive back to the store in separate cars. Wife said that during the drive, she and Husband pulled up next to each other so they could talk to each other through the car windows—Wife did not have a cell phone. Wife denied that she and Husband tried to run each other off the road. She owned both cars and would not try to hit her own car.

There was also a factual dispute about what happened when Husband and Wife returned to Hunt's home after the second trip to the store. By the time Lt. Marker returned Raulerson's call about his complaint, Husband and Wife were back at Hunt's house. Raulerson reported to Marker his claims about Husband and Wife trying to run each other off the road. And then, while he was on the phone with Marker, Raulerson reported that he saw Husband strike Wife in the face. Raulerson told Marker that it looked like Husband was killing Wife and that Raulerson "was going to have to go over there and shoot the guy." Marker responded immediately, making it clear that Marker was on the way to deal with the situation and that Raulerson should not leave his residence. Raulerson later admitted that he heard Marker say that he was twelve minutes away, but Raulerson denied hearing the instruction to remain at his residence. Instead, Raulerson drove over to Hunt's property.

Meanwhile, Raulerson's live-in girlfriend called 911. She told the 911 operator that Husband and Wife were engaged in a fight and that the police needed to be dispatched.

Husband and Wife testified that after they put the groceries away, they returned to Wife's car to avoid arguing in front of Hunt. Husband admitted that he shoved Wife as they were walking back to the car and that she fell to the ground.

When Raulerson arrived at Hunt's house, he stated that he saw Husband and Wife sitting inside the car. The car was parked facing the house. The driveway to leave the property was located to the right of the car. Wife was seated in the driver's seat, and Husband was seated in the passenger's seat. Raulerson claimed that he saw Husband with his hands around Wife's neck. Raulerson armed himself with an AR-15 platform pistol that he kept in his truck.

After arming himself, Raulerson walked to the driver's side of the car, where Wife was sitting. Raulerson was about four steps away from the car when he aimed his gun through the driver's side window and said, "get out of the car," and "get on the ground" several times. Raulerson did not specify whether he was referring to Husband or Wife when he gave those instructions.

Husband and Wife testified that with Raulerson yelling and pointing a gun at them, they exited the car. Raulerson pointed his gun at Wife when she tried to talk to him. Raulerson then pointed his gun at Husband when he tried to talk. Raulerson ordered Husband to lie on his stomach on the ground. Husband instead walked around the back of the car and toward Raulerson. Husband told Raulerson to fight him like a man. Raulerson then took a step back. But as Raulerson pointed the gun at Wife, Husband got back into the car to drive away. At that point, Raulerson stood about five feet from the front of Hunt's front porch. Wife was standing close to Raulerson on the driver's side of the car. Hunt was standing a few feet behind Raulerson. Husband explained that if he turned the car to the left, he would have hit Raulerson, Wife, and Hunt's home.

Instead, Husband turned the car all the way to the right to exit the property. Raulerson then yelled that Husband was under citizen's arrest. As he was driving away, Husband heard two gunshots. Raulerson fired at Husband about two or three seconds after the car started to move. It took Husband a few moments to realize that he had been shot twice in his left upper thigh. The forensic evidence showed that two bullets pierced the driver's side door, with the first bullet entering the middle of the door and the second bullet entering near the door handle.

Raulerson disputed that Husband was trying to leave the property. Raulerson claimed that Husband drove straight at him and that he was "dead square center" with the front bumper of the car. Raulerson maintained that he heard the thump of the accelerator hitting the floor. He then screamed for Husband to stop and jumped to the side. He claimed that Husband compensated for his movement, which caused him to fear for his life. When he

4

jumped a second time, Raulerson claimed that he fired two bullets in mid-air. He stated that he saw both bullets strike Husband.

But forensic evidence contradicted Raulerson's claims about his position and the movement of the vehicle when he fired the AR-15 into the car. The tire track evidence showed that the car immediately began turning as it began to move. The State's expert determined that Raulerson was standing to the side of the car when he fired the first shot and that the second shot was fired as the car was moving away from Raulerson. Even Raulerson's own expert concluded that Raulerson was seven to nine feet away from the car when Raulerson fired his gun at the car. Raulerson's expert also concluded that Raulerson was near the left-front wheel well, left-front fender area—not standing directly in front of the car— when he discharged his weapon and that the car was turning right when the shots were fired.

After Husband was shot, Raulerson would not let Wife leave the area. When Lt. Marker arrived, Raulerson told him that he fired two shots in the car. But Raulerson never reported to the officer that Husband was trying to run him over.

After weighing the testimony and making credibility determinations, the trial court denied Raulerson's motion to dismiss. The court found that even if Raulerson had the authority to make a citizen's arrest, he was not entitled to self-defense immunity because Raulerson did not have an objectively reasonable belief that use of deadly force was necessary to defend himself from Husband and also that force was not reasonably necessary to prevent Husband's escape.

*Analysis*

Raulerson argues that this Court should grant his petition for a writ of prohibition because he is entitled to self-defense immunity. He claims that he was making a citizen's arrest when, while armed with an AR-15 platform pistol, he detained Husband and Wife in their car. Raulerson contends that he had the authority to make the arrest and detain Husband because Husband was committing an aggravated battery, and he was justified in using force to prevent Husband's escape. Then when

5

Husband tried to run him over with his car and Raulerson shot at the car, Raulerson claims that he had an objectively reasonable fear that he was in imminent danger of great bodily harm.

To begin with, this is not an appeal from a nonfinal order in which this Court reviews the circuit court's ruling for an abuse of discretion or for legal error. Rather, Raulerson seeks to invoke the writ authority of this Court, asking for the issuance of the extraordinary writ of prohibition.[1] *Fla. Dep't of Rev. v. Int'l Bonded*

---

[1] Several district courts questioned whether prohibition is an appropriate vehicle for an appellate court to address a trial court's ruling on a self-defense immunity motion. *See Nadell v. Hursey*, 363 So. 3d 1135, 1138–39 (Fla. 3d DCA 2023); *Snow v. State*, 352 So. 3d 529, 532–34 (Fla. 1st DCA 2022); *Edwards*, 351 So. 3d 1142, 1146 n.2 (Fla. 1st DCA 2022). The Third District certified this question to the Florida Supreme Court: "Is prohibition the appropriate remedy for a civil defendant to challenge a nonfinal order denying the defendant's motion for statutory immunity under Florida's Stand Your Ground Law?" *Nadell*, 363 So. 3d at 1140. But the supreme court declined review. *Nadell v. Hursey*, No. SC2023-1079, 2023 WL 8948388 (Fla. Dec. 28, 2023). The Third District also referred to the Florida Bar's Appellate Rules Committee "the issue of whether rule 9.130's list of appealable nonfinal orders should be amended to include appeals from nonfinal orders denying a civil defendant's motion for statutory immunity under SYG." *Nadell*, 363 So. 3d at 1138–39. The supreme court ultimately amended Florida Rule of Appellate Procedure 9.130(a)(3) to allow "civil defendants to appeal nonfinal orders that deny claims of immunity brought under section 776.032, Florida Statutes (2024)." *See In re Amends. to Fla. Rules of App. Proc.*, No. SC2024-0317, 2025 WL 715788 at *1 (Fla. Mar. 6, 2025). Even so, the Court declined the invitation to amend the rule to allow criminal defendants to appeal nonfinal orders denying immunity motions. *Id.* at *2. The Court explained that the writ of prohibition provides an adequate means to challenge such an order:

> We do not suggest that a criminal defendant who hopes
> to challenge a nonfinal order denying a claim of Stand

6

*Couriers, Inc.*, 356 So. 3d 320, 323 (Fla. 1st DCA 2023) ("[T]he writ of prohibition will not be invoked for slight reasons, but only in emergency cases to forestall an impending, present injury." (quoting *Joughin v. Parks*, 147 So. 273, 274 (1933))).

On the facts before us, we decline to exercise our prerogative to grant Raulerson's petition. *See English v. McCrary*, 348 So. 2d 293, 297 (Fla. 1977) ("[O]nly when damage is likely to follow the inferior court's acting without authority of law or in excess of jurisdiction will the writ issue."); *Fla. Dep't of Transp. v. Miami-Dade Cnty. Expressway Auth.*, 298 So. 3d 1261, 1263 (Fla. 1st DCA 2020) ("The 'writ is very narrow in scope and operation and must be employed with caution and utilized only in emergency cases to prevent impending injury where there is no other appropriate and adequate legal remedy.'" (quoting *Mandico v. Taos Constr. Inc.*, 605 So. 2d 840, 854 (Fla. 1992))).

Raulerson claimed that he was making a citizen's arrest when he detained Husband and Wife and held them at gunpoint. No doubt citizen's arrests were permissible under the common law. *Edwards v. State*, 462 So. 2d 581, 582 (Fla. 4th DCA 1985) ("At common law, a private citizen may arrest a person who in the citizen's presence commits a felony or breach of the peace."). Florida adopted the common law of England as of July 4, 1776. *See* § 2.01, Fla. Stat. Even so, as explained in the concurring opinion,

---

Your Ground immunity will have no avenue for relief. We have stated previously that the constitutional writ of prohibition may be invoked in such circumstances. *See Boston v. State*, 326 So. 3d 673, 677 (Fla. 2021) (declaring that "a defendant who avails him or herself to a pretrial immunity hearing and who believes legal error was committed at the pretrial immunity hearing may still seek relief by filing a petition for a writ of prohibition before invoking his or her right to a trial") (emphasis omitted) (footnote omitted). We reiterate the availability of that remedy now.

*Id.*

Raulerson's claim of authority to effect a citizen's arrest is dubious on the law and on the facts.

But this case need not turn on Raulerson's assertion of authority to make a citizen's arrest. Raulerson has failed to show clearly and conclusively, without a good faith dispute, that when Husband was driving away from the scene and Raulerson twice fired his weapon into Husband's car, Raulerson had an objectively reasonable belief that he faced an imminent threat of great bodily harm or death.

To raise a prima facie claim of self-defense immunity under section 776.032(1), Raulerson had to show that the elements of justifiable force were met. *See Edwards v. State*, 351 So. 3d 1142, 1148–49 (Fla. 1st DCA 2022). Section 776.012(2), Florida Statutes (2019), provides:

> A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony. A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

To demonstrate that his use of deadly force was justifiable, Raulerson had to allege specific facts that show or tended to show that he (1) used deadly force, (2) reasonably believed deadly force was necessary to prevent imminent death or great bodily harm to himself or another, (3) used such deadly force while resisting the victim's attempt to murder him or to commit a forcible felony on him, and (4) was not otherwise engaged in criminal activity and was in place he had a right to be.[2]

---

[2] As stated above, the majority's decision does not address whether Raulerson had the authority to make a citizen's arrest

In reviewing Raulerson's claim of using deadly force in self-defense, the trial court had to determine whether a reasonable person in Raulerson's position would have used the same force as Raulerson. *See* § 776.012, Fla. Stat.; *Craven v. State*, 285 So. 3d 992, 994 (Fla. 1st DCA 2019). "[T]he appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of force." *Garrett v. State*, 148 So. 3d 466, 468 (Fla. 1st DCA 2014). The trial court concluded that Raulerson did not have an objectively reasonable belief that he needed to use deadly force to prevent imminent death or great bodily harm.

In reaching this conclusion, the trial court made these factual findings. On the morning of the shooting, Husband and Wife were arguing in Hunt's front yard. Husband struck Wife, knocking her to the ground. The two entered Wife's car, where Husband choked Wife. When Raulerson observed these actions, his immediate reaction was to report to a law enforcement officer that he might have to go to over there to shoot Husband. He had this reaction even though he had no reason to believe that Husband or Wife were armed. Even after Lt. Marker said he was minutes away, Raulerson decided to drive over to Hunt's house to confront Husband and Wife, armed with an AR-15 pistol. The trial court found credible the testimony of Lt. Marker—that Raulerson approached Husband "ready to shoot him."

---

when he detained Husband and Wife at gunpoint and against their will. But if Raulerson lacked authority to make a citizen's arrest, the unlawful detention of Husband and Wife by force and against their will would amount to the commission of the felony offense of false imprisonment. *See* § 787.02(1), Fla. Stat. (2019) ("The term 'false imprisonment' means forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will."). And if Raulerson were committing the crime of false imprisonment, his use of deadly force would not have been justified under section 776.012(2).

9

The trial court found that Raulerson then confronted the two unarmed individuals, pointed the AR-15 pistol at them, ordered them out of their own car, and instructed them to lie on the ground. When they would not obey his orders after exiting the car, Raulerson continued to aim his loaded gun at them.

The trial court found incredible Raulerson's claim that, while in mid-air and jumping out of the way of an oncoming car, he fired two rounds at Husband who was driving directly toward him and accelerating. Rather, the trial court found that there was clear and convincing evidence to show that Raulerson was standing to the left of the car and that Husband was attempting to leave the property. It also concluded that Raulerson could have shot at the car's tires or engine compartment instead of directly at Husband.

Raulerson has failed to show that there is no dispute that he is entitled to immunity. As the trial court found, the testimonial and physical evidence conflict with Raulerson's version of events. Wife and Hunt were standing a few feet from Raulerson when Husband allegedly accelerated toward Raulerson. But neither reported jumping out of the way to avoid being hit. And Wife testified that Raulerson was standing to the left of the car when he fired his gun.

The physical evidence also conflicted with Raulerson's version of events. The tire tracks showed that Husband immediately turned right as the car moved forward—not left where Raulerson was standing. Raulerson fired two shots; both rounds pierced the driver's side door. The first hole was in the middle of the driver's side door, and the second hole was near the door handle. Both forensic experts examined the entry paths of the bullets and concluded that Raulerson could not have been standing directly in front of the car when he fired his AR-15.

On these facts, Raulerson has failed to show clearly and conclusively that he is immune from prosecution and that the trial court is acting beyond its jurisdiction. For these reasons, we deny Raulerson's petition for a writ of prohibition.

DENIED.

10

KELSEY, J., concurs in result only; TANENBAUM, J., concurs with opinion.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

TANENBAUM, J., concurring.

The record fails to demonstrate clearly and conclusively that the petitioner is immune from prosecution, so I agree that he is not entitled to the extraordinary relief being sought. There is no need, however, to assess the trial court's fact determinations for evidence sufficiency. Even though our court and other district courts repeatedly have treated petitions like this one like appeals, the Florida Constitution does not provide that type of review authority. Moreover, the supreme court has *expressly* foreclosed such use of the writ of prohibition for over 120 years. We should hew to the supreme court's consistent directive over the years that the writ's scope remain narrow—reserved for emergencies when a trial court proposes to act beyond its jurisdiction; *never* to be used for direct appellate review. Under this mandated approach, I am not convinced by the petition and the record that the trial court indisputably will exceed its jurisdiction if prosecution of the petitioner is allowed to continue.

I

A

The supreme court continues to follow the ancient English view on the writ of prohibition:

Prohibition is an extraordinary writ, a prerogative writ, extremely narrow in scope and operation, by which a superior court, having appellate and supervisory jurisdiction over an inferior court or tribunal possessing judicial or quasi-judicial power, may prevent such inferior

11

court or tribunal from exceeding jurisdiction or usurping jurisdiction over matters not within its jurisdiction.

*English v. McCrary*, 348 So. 2d 293, 296 (Fla. 1977). It is "employed with great caution and utilized only in emergencies." *Id.*; *see also id.* at 297 ("Prohibition will be invoked only in emergency cases to forestall an impending present injury where person seeking writ has no other appropriate and adequate legal remedy."). The supreme court determined that one such emergency is the need to enforce a defendant's statutory immunity against continued criminal prosecution based on evidence he was compelled to give. *See State ex rel. Marshall v. Petteway*, 164 So. 872, 874 (Fla. 1935); *State ex rel. Byer v. Willard*, 54 So. 2d 179, 182–83 (Fla. 1951).

The district courts of appeal later extended this scope to also include enforcing a criminal defendant's claimed justified-use-of-force immunity against continued prosecution; an extension to which the supreme court has given its implicit imprimatur. *See Bretherick v. State*, 170 So. 3d 766, 778 (Fla. 2015); *Boston v. State*, 326 So. 3d 673, 677 (Fla. 2021); *see also In re Amends. to Fla. Rules of App. Proc.*, No. SC2024-0317, 2025 WL 715788, at *2 (Fla. Mar. 6, 2025). Oddly, though, this court stated that review of a trial court's denial of immunity in prohibition "is governed by the same standard which applies *in an appeal* from an order denying a motion to suppress"; it cited no authority and provided no analysis to support such an imprecise observation. *Hair v. State*, 17 So. 3d 804, 805 (Fla. 1st DCA 2009) (emphasis supplied). Other district courts nevertheless followed suit. So instead of properly treating these petitions as invoking their *limited* writ authority under Article V, section 4(b)(3) of the Florida Constitution, the district courts have been handling prohibition in this context as if their *appellate* jurisdiction under Article V, section 4(b)(1)—specifically, jurisdiction to review an interlocutory order as authorized by supreme court rule—had been invoked.[1] In doing so, the courts

---

[1] A district court of appeal has only appellate jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const. (recognizing that the district court has "*jurisdiction* to hear appeals" (emphasis supplied)). While the district court has authority to issue enumerated extraordinary writs and other writs, that authority does not equate with original

have failed to understand a threshold proposition: that a district court cannot both apply an *appellate* standard of review in an extraordinary writ proceeding and *not* obliterate the constitutional distinction between the court's appellate jurisdiction and its writ authority as a supervisory court.

There ought to be no "struggling" with this point. *Cf. Nadell v. Hursey*, 363 So. 3d 1135, 1139 (Fla. 3d DCA 2023) (noting how district courts are "struggling" with how prohibition should be utilized in these immunity matters). The district courts' approach to prohibition regarding self-defense immunity (*i.e.*, engaging essentially in direct review)—never used or approved by the supreme court—runs afoul of both the Florida Constitution and the categorical limitations expressly imposed on the writ by the supreme court as far back as 1898.

The constitution provides a district court of appeal jurisdiction to review final judgments and orders of the trial courts, and that review may be sought as a matter of right. *See* Art. V, § 4(b)(1), Fla. Const. The district court, however, *does not* have jurisdiction to consider a *non-final* order appeal *unless* authorized by supreme court rule. *See id.* (authorizing district court review of "interlocutory orders in such cases to the extent provided by rules adopted by the supreme court"); *Mintz Truppman, P.A. v. Cozen O'Connor, PLC*, 346 So. 3d 577, 580 (Fla. 2022) ("Florida's district courts may review only those interlocutory orders allowed by the rules of this Court."); *cf. Vericker v. Powell*, No. SC2022-1042, 2025 WL 922413, at *2 (Fla. Mar. 27, 2025) ("It is well established that district courts of appeal generally lack authority to review nonfinal orders until after the trial court issues a final judgment."). Only the supreme court—not the district courts and not the Legislature—has the "power to define the scope of interlocutory appeals." *State v. Gaines*, 770 So. 2d 1221, 1225 (Fla. 2000); *cf.*

---

jurisdiction—except, perhaps, for habeas authority. Rather, the district court may issue those writs to aid the exercise of its appellate jurisdiction. *Cf.* Art. V, § 4(b)(3), Fla. Const. The constitution expressly gives "original jurisdiction" only to the circuit court, which also is the only court to possess both original and appellate jurisdiction. *See* Art. V, § 5(b), Fla. Const.

13

*State v. Smith*, 260 So. 2d 489, 491 (Fla. 1972) (explaining that the constitution "does not authorize the legislature to provide for interlocutory review," so "any statute purporting to grant interlocutory appeals is clearly a declaration of legislative policy and no more" and is void "unless the Supreme Court of Florida adopts such statute as its own").

Whether a non-final order is subject to *direct* appellate review (instead of indirectly, through an assessment of the record to determine entitlement to extraordinary-writ relief against a trial judge) is purely a policy call the supreme court gets to make for the courts. *See Travelers Ins. Co. v. Bruns*, 443 So. 2d 959, 961 (Fla. 1984) (explaining that "[t]he thrust of rule 9.130 is to restrict the number of appealable nonfinal orders," the theory being "that appellate review of nonfinal judgments serves to waste court resources and needlessly delays final judgment"); *Jaye v. Royal Saxon, Inc.*, 720 So. 2d 214, 215 (Fla. 1998) ("The judicial policy in favor of limited certiorari review is based on the notion that piecemeal review of nonfinal trial court orders will impede the orderly administration of justice and serve only to delay and harass."); *cf. Mandico v. Taos Const., Inc.*, 605 So. 2d 850, 854 (Fla. 1992) (adding a non-final order to Florida Rule of Appellate Procedure 9.130 "[b]ecause we are sensitive to the concern for an early resolution of controlling issues"); *Univ. of Fla. Bd. of Trs. v. Carmody*, 372 So. 3d 246, 255 (Fla. 2023) ("And it is within our constitutional authority to ensure that Florida's procedural rules of court manifest the substantive legal enactments of the Legislature."); *Vericker*, No. SC2022-1042, 2025 WL 922413, at *5 (agreeing that adoption of new rule allowing for "immediate review of nonfinal orders denying qualifying Anti-SLAPP motions" is warranted "to conform[] to" legislative policy).

Indeed, the supreme court recently considered a rule-amendment proposal to authorize direct appellate review of self-defense immunity interlocutory orders in criminal cases. The court made a policy assessment leading to its rejecting the proposal in favor of prohibition as the avenue for any immediate relief. *See In re Amends. to Fla. Rules of App. Proc.*, No. SC2024-0317, 2025 WL 715788, at *1–2 (noting "there are very few circumstances where interlocutory appeals are authorized in criminal proceedings," which "do not include challenges against nonfinal orders denying

14

statutory immunity"; so declining to adopt the rule change out of concern for "unique problems" that might arise in the context of those proceedings).[2] The district courts of appeal, then, *still* lack the constitutional authority to directly review a denial of self-defense immunity as if the order is on appeal—by writ or otherwise. While the writ of prohibition obviously is available as a remedy in this context, considerations on whether to grant it must be commensurate with the extraordinary remedy that the writ is. A petition for the writ is not the same as an appeal, and it cannot be handled as if it is—which the supreme court has been saying for most of the State's jurisprudential history.

B

The writ of prohibition being extraordinary and lying outside the established constitutional pathways for appellate review; the supreme court has "strictly enforced" the "fundamental principle" that prohibition "is *never* allowed to usurp the functions of a writ of error or certiorari, and can *never* be employed as a process for the correction of errors of inferior tribunals." *State v. Malone*, 23 So. 575, 576 (Fla. 1898) (emphases supplied);[3] *id.* (noting that the writ "is *never* allowed to usurp the office of a writ of error, or an appeal" (emphasis supplied)); *see State ex rel. B. F. Goodrich Co. v. Trammell*, 192 So. 175, 176–77 (Fla. 1939) ("The writ of prohibition is never allowed to usurp the functions of an appeal, writ of error or certiorari."); *Mintz Truppman*, 346 So. 3d at 580 (warning

---

[2] Even though the proposed rule change would have given a criminal defendant the more favorable review parameters that accompany direct appellate review—instead of an extraordinary, prerogative writ's more stringent parameters—the Florida Public Defender Association vigorously opposed it.

[3] This decision may be old—found primarily in those "dusty books"—but it is still good law. *See Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002) (expressly stating that the supreme court "does not intentionally overrule itself sub silentio," so when faced with "an express holding . . . on a specific issue and a subsequent contrary dicta statement on the same specific issue," a lower court must "apply [the] express holding in the former decision until such time as [the supreme court] recedes from the express holding").

against use of the writ of prohibition "to end-run our rules on appeals generally and interlocutory appeals in particular").

So when the supreme court says a writ of prohibition is "an appropriate remedy," it does not mean the writ can be "deployed to *reverse* a trial court's order on the merits of a case." *Mintz Truppman*, 346 So. 3d at 581 (emphasis supplied); *see English*, 348 So. 2d at 296–97 (explaining that prohibition is "preventive and *not corrective*," its purpose being "to prevent the doing of something, *not* to compel the *undoing* of something already done," *not* "to revoke an order already entered" (emphases supplied)). To this day, the office of prohibition is reserved for when "a [lower] court has proposed to act in excess of its subject matter jurisdiction." *Mintz Truppman*, 346 So. 3d at 581. It should be clear from all this that prohibition *is not a review writ*.

In turn, the trial court's order on self-defense immunity is not what is being reviewed in a prohibition proceeding. The supreme court—once again, for over 120 years—has distinguished "between the assumption of a jurisdiction to which the court has no legal claim, and the mere erroneous exercise of a jurisdiction with which the court is invested." *Malone*, 23 So. at 576; *see State ex rel. Schwarz v. Heffernan*, 194 So. 313, 314 (Fla. 1940) ("It is fundamental that prohibition does not lie to correct errors of a court which is acting within its jurisdiction, although proceeding improperly in the exercise of its jurisdiction."); *Mintz Truppman*, 346 So. 3d at 580 ("We have consistently said that the purpose of the writ is to prevent a court's action beyond the scope of its jurisdiction, not to correct an erroneous exercise of jurisdiction.").

Naturally, "[e]very court has judicial power to hear and determine the question of its own jurisdiction, both as to parties and as to subject matter, and necessarily does so by proceeding in the cause." *B.F. Goodrich Co.*, 192 So. at 177 (quotation and citation omitted). When there is a good-faith representation to the court that it lacks jurisdiction, the trial court "will examine the grounds of its jurisdiction before proceeding further," and it "may receive testimony on a preliminary question to" make that

16

determination. *Id.* (quotation and citation omitted).[4] The trial court "having jurisdiction to decide as to its own jurisdiction in any particular case, it follows that its decision will have the same effect and conclusiveness as would its decision on any other matter within its jurisdiction." *Id.* (quotation and citation omitted). The court's adjudication of a jurisdictional fact that "it is required to ascertain . . . is *conclusive* on the question of jurisdiction, until set aside or reversed by direct proceedings." *Id.* (emphasis supplied) (quotation and citation omitted). "If the existence of jurisdiction depends on controverted facts which the inferior court has the jurisdiction to determine, and the court errs in the exercise thereof, *prohibition is not available.*" *English*, 348 So. 2d at 298 (emphasis supplied).

In prohibition, then, how the trial court weighed the evidence or whether there was sufficient evidence to support the court's determination of self-defense immunity is not for our consideration. *See Schwarz*, 194 So. at 314 (precluding use of prohibition to consider whether a lower court erred in determining "controverted facts which the [] court has the jurisdiction to determine"); *State ex rel. Hendricks v. Hunt*, 70 So. 2d 301, 306 (Fla. 1954) (noting that it is "settled that the sufficiency of the evidence to support any particular order made by the respondent judge in the exercise of the jurisdiction conferred by the statute *is not a matter that may be determined in a prohibition proceeding* but can be decided only by an appeal from the order" (emphasis supplied)); *Mandico*, 605 So. 2d at 854 (noting that prohibition may not "be used *to test the correctness* of a lower tribunal's ruling on jurisdiction where the existence of jurisdiction depends on controverted facts that the inferior tribunal has jurisdiction to determine" (citing *English*, 348 So. 2d at 298) (emphasis supplied)); *cf. Tsavaris v. Scruggs*, 360 So. 2d 745, 752 (Fla. 1977) (noting in seminal immunity-from-prosecution case that review of

---

[4] Section 776.032(4), Florida Statutes, in fact expressly gives the trial court this jurisdiction, requiring it to hold a "pretrial immunity hearing," where the defendant must raise a "prima facie claim of self-defense immunity from criminal prosecution"; after which the state must present "clear and convincing evidence" that "overcome[s]" the claimed immunity.

17

an order on a motion to suppress, had one been filed, "would not be appropriate" in prohibition).

The only question that could be before us in prohibition is whether, as a matter of law and on the face of the record, the lower court clearly and indisputably is acting or proposing to act beyond its jurisdiction. *See B.F. Goodrich*, 192 So. at 176 (denying prohibition because the "questions presented here are to such a large extent questions of fact (alleged but not yet proven), as well as of law, that lack of jurisdiction is not made *conclusively* to appear" (emphasis supplied)); *id.* at 177 (explaining that "where the question of jurisdiction is one of law, a court cannot by an erroneous decision acquire jurisdiction which it has not, or divest itself of jurisdiction which it has" (quotation and citation omitted)); *id.* (determining there were "not sufficient grounds shown upon the face of the record" to warrant relief through prohibition); *English*, 348 So. at 298 (requiring that request for prohibition "affirmatively show lack of jurisdiction in the lower court"); *cf. State v. White*, 24 So. 160, 167 (Fla. 1898) (looking to whether court's acting in excess of jurisdiction "is apparent upon the face of the proceedings" to determine whether "prohibition will lie"); *State ex rel. Jacksonville Ice & Cold Storage Co. v. Gray*, 177 So. 849, 850 (Fla. 1937) (suggesting that prohibition lies only where there "is a question of law and no discretion involved, and the ruling was one affecting the exercise of jurisdiction"); *State ex rel. Byer v. Willard*, 54 So. 2d 179, 180 (Fla. 1951) (looking to "material facts shown by the record" to determine whether to grant writ). The supreme court's unmistakably consistent position on prohibition over more than a century controls how we handle these prohibition petitions regarding self-defense immunity, notwithstanding what the practice has been among the district courts of appeal— seemingly based on a single unsupported and unelucidated sentence in one decision of this court.

C

Thus, there is only one question for me in this case: whether the record before us demonstrates *clearly* and *conclusively*, without a bona-fide factual dispute, that the petitioner is immune from prosecution and the trial court is proposing to proceed without the

constitutional or statutory power to do so. My answer is a firm no, as I explain next.

## II

## A

A person has immunity when his use of force is legally justified. *See* § 776.032(1), Fla. Stat. (providing immunity "from criminal prosecution" to a person "who uses force as permitted in s. 776.012, s. 776.013, or s. 776.031," except when force is used against a law enforcement officer). Under section 776.012(2), Florida Statutes,

> [a] person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.

This immunity, however, is not available if the person "[i]s attempting to commit, committing, or escaping after the commission of, a forcible felony." § 776.041(1), Fla. Stat. Moreover, a person "engaged in a criminal activity" or located "in a place where he [] [does not have] a right to be" has "a duty to retreat" rather than an entitlement to stand his ground and face the threat with force. § 776.012(2), Fla. Stat.[5]

As already discussed, this immunity's availability bears on a trial court's jurisdiction to allow a criminal prosecution to proceed, and the court has statutory jurisdiction to resolve a factual dispute bearing on that availability. *See* § 776.032(4), Fla. Stat. (providing for a "pretrial immunity hearing" at which the State must overcome a defendant's *prima facie* case of immunity with "clear and convincing evidence"). In this case, the State called several

---

[5] Ancillary to my analysis is the separate observation that the petitioner did not have the *right* to be on the property, only a license or privilege to be there—at the property owner's invitation. This is another reason the petitioner is not entitled to immunity.

witnesses at the pre-trial hearing on the petitioner's claim under this provision, and those witnesses' testimony, according to the trial court, constituted clear and convincing evidence that overcame the petitioner's immunity claim. *See id.* The petitioner having testified as well, there necessarily was a conflict in the evidence, a conflict the trial court resolved with credibility determinations—including a conclusion that the petitioner's testimony was *not* credible. In the context of this prohibition petition, the trial court's resolution of the evidentiary conflict is conclusive and not reviewable. *See B.F. Goodrich Co.*, 192 So. at 177.[6] The question for us is whether, when applying the law to those facts, the petitioner is clearly immune. *Cf. Smith v. State*, 387 So. 3d 495, 496 (Fla. 1st DCA 2024) (granting writ of prohibition after applying law to undisputed facts found by the trial court and concluding the petitioner was entitled to immunity).[7]

There does not appear to be a dispute basically about one threshold fact leading to the events for which the petitioner was charged: He approached the two victims (a husband and wife) in their car while they were fighting and ordered them, *at gunpoint*, to exit and lie face-down on the ground. This means the petitioner arguably was committing at least two forcible felonies by the time the husband hopped into a car and supposedly took off in the petitioner's direction: aggravated assault and false imprisonment. *See* § 776.08, Fla. Stat. (defining "forcible felony" to include "aggravated assault" and "any other felony which involves the use or threat of physical force or violence against any individual"); § 787.02(1)(a), (2), Fla. Stat. (making it a third-degree felony to "forcibly, by threat . . . restrain[] another person *without lawful authority* and against her or his will" (emphasis supplied));

---

[6] The petitioner does not contend that the trial court failed to properly afford him the evidentiary hearing to which he is statutorily entitled. If he had, it would have been a claim to be addressed in *certiorari*, not prohibition. *See Edwards v. State*, 351 So. 3d 1142, 1146 (Fla. 1st DCA 2022).

[7] In appellate standard-of-review parlance, this would be akin to *de novo* consideration.

§§ 784.011(1), 784.021(1)–(2), Fla. Stat. (establishing a third-degree felony for the "intentional, *unlawful* threat by word or act to do violence to the person of another," while using a deadly weapon, coupled with the "doing some act which creates a well-founded fear in such other person that such violence is imminent" (emphasis supplied)).

The petitioner contends he was acting lawfully because he was making a common-law "citizen's arrest," rendering the highlighted text above inapplicable. The trial court accepted that there was such a thing and considered only whether the petitioner acted reasonably in shooting to prevent an escape. *See* § 776.07(1), Fla. Stat. (providing for justified use of force when a "law enforcement officer or other person who has an arrested person in his or her custody" and he "reasonably believes" the force "to be necessary to prevent the escape of the arrested person from custody"). Though the citizen's arrest was an ancient common-law concept—one initially imported into Florida's substantive law—extensive statutory law enacted since then is not consistent with its continued operation with respect to private persons acting alone. If there no longer is a common-law "citizen's arrest" in Florida for private persons, then the petitioner was not acting with lawful authority when he held the victims under threat of a deadly weapon, and immunity is not available to him under chapter 776, Florida Statutes.

B

At English common law, the citizen's arrest was required of any person present when a felony was committed. *See* WILLIAM HAWKINS, 2 A TREATISE OF THE PLEAS OF THE CROWN Bk. 2, ch. 2, 114–16, §§ 1–7 (8th ed. 1824); WILLIAM BLACKSTONE, 4 COMMENTARIES *191–92 (Oxford Press 2016). Citizens also were required to heed a summons by a sheriff or constable to pursue and arrest a person suspected of having committed a felony—known as hue and cry—and all citizens present at the commission of a felony were required to organize pursuit of the suspect. *See* 3 Edw. 1, ch. 9 (First Statute of Westminster (1275)); 13 Edw. 1, stat. 2, ch. 1 (Second Statute of Winchester (1285)); EDWARD COKE, 3 INSTITUTES OF THE LAWS OF ENGLAND 116–17 (1644). These concepts came into Florida's substantive law when the Legislature

adopted "[t]he common and statute laws of England . . . down to the 4th day of July, 1776." § 2.01, Fla. Stat.

Preservation of the ancient English law as Florida's substantive law goes only so far: as long that it is "not inconsistent with the Constitution and laws of the United States and *the acts of the Legislature of this state.*" *Id.* (emphasis supplied); *see also* § 775.01, Fla. Stat. (putting into effect English common law "in relation to crimes . . . where there is no existing provision by statute on the subject"). Relevant here, the Legislature undoubtedly has adopted "general and comprehensive statutes that are designed to regulate" the "entire subject" regarding law enforcement officers, peace officers, arrests, and detention (including by private persons), so those statutes "supersede all common-law rules in the premises, and the valid provisions of the statutes are the controlling law." *See Broward v. Broward*, 117 So. 691, 693 (Fla. 1928); *see also id.* (explaining how "a statute may expressly or by implication supersede the common law," in turn becoming "the controlling law *within its proper sphere of operation*" (emphasis supplied)); *Banfield v. Addington*, 140 So. 893, 899 (Fla. 1932) (noting well-settled rule of Florida jurisprudence that "the common law may be modified indirectly as well as directly, by a statute which is 'inconsistent' with the common law in a particular instance"); *Ripley v. Ewell*, 61 So. 2d 420, 421 (Fla. 1952), *overruled on other grounds by Gates v. Foley*, 247 So. 2d 40 (Fla. 1971) (explaining that section 2.01, Florida Statutes, "preserves the common law only in those cases where it is 'not inconsistent' with the acts of the Legislature," so "[i]t is not necessary that a statute be in direct *conflict* with the common law before the latter may be superseded, *inconsistency* being sufficient" (second emphasis supplied)).[8]

---

[8] *But cf. Cullen v. Seaboard Air Line R. Co.*, 58 So. 182, 183 (Fla. 1912) (requiring a clear legislative intent to statutorily abrogate a common-law right of action); *City of Hialeah v. State ex rel. Morris*, 183 So. 745, 747–48 (Fla. 1938) (requiring "explicit and clear" statutory abrogation of common-law rules relating to rights of action, such abrogation not being inferred or implied); *Thornber v. City of Ft. Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990) (stating

The abrogation in this space started early in Florida's history. Indeed, the Legislature in 1845 directed a compilation of English statute law still in effect in Florida, which was prepared by Leslie Thompson in 1853 but officially published years later, upon being revised and summarized, as a supplementary third volume of the 1941 Florida Statutes (titled "Helpful and Useful Matter") under a subsequent legislative directive. *See* § 16.44(2), (11), Fla Stat. (1941) (Supp. 1945). The compilation determined, even then, at least one aspect of the common-law's "method of apprehending criminals [by citizens]"—hue and cry—"[was] not consistent with our police and law enforcement procedures." Florida Statutes vol. 3 at 34 (1941). It also observed that, by statute, a Florida sheriff already had authority to "raise the power of the county and command any person to assist him, when necessary, in the execution of the duties of his office." § 144.02, Fla. Stat. (1941); *see* § 30.15(1)(h), Fla. Stat. (setting out the same authority in successor statute, and providing for punishment of someone who "refuses or neglects to render such assistance"); *cf. South v. State of Maryland for use of Pottle*, 59 U.S. 396, 402 (1855) (describing how, as a "conservator of the peace," the English sheriff "may command the *posse comitatus* or power of the country" to pursue and arrest felons on the run).

A close look at the Florida Statutes reveals further evidence the Legislature has opted to give law-enforcement officers and other peace officers[9] the authority to arrest without a warrant,

---

that when it comes to common-law rights of action, the "presumption is that no change . . . is intended unless the statute is explicit and clear in that regard"); *State v. Ashley*, 701 So. 2d 338, 341 (Fla. 1997) (requiring unequivocal statutory statement for abrogation of common-law immunity from prosecution).

[9] A peace officer is synonymous with a "conservator of the peace," which is an officer of the government vested by the sovereign with authority to stop breaches of the peace (including riots and mayhem) as they are happening, rather than pursuing arrest after the breach as part of the law's enforcement. *See State of Maryland for use of Pottle*, 59 U.S. at 402–03 (explaining how historically, the "conservator of the peace in his county or bailiwick

rather than persist in leaving to every citizen the duty and authority to keep the public peace. First, there are the demanding requirements for someone to be certified as a law enforcement officer, an officer having the power to both bear arms and arrest. *See* § 943.09, Fla. Stat. (establishing Criminal Justice Professionalism Program); § 943.13, Fla. Stat. (setting out minimum qualifications, including a certified training requirement, for any person to be employed as a law enforcement officer by an "employing agency," defined by section 943.10(4), Florida Statutes, to be a governmental entity with constitutional

---

. . . is the representative of the king, or sovereign power of the State" who may "upon view, without writ or process, commit to prison all persons who break the peace or attempt to break it" and "command the *posse comitatus* or power of the country" to pursue felons and traitors; ultimately "wielding the executive power for the preservation of the public peace"); *City of Chicago v. Morales*, 527 U.S. 41, 106–08 (1999) (Thomas, J., dissenting) (referencing how the "criminal law deals with offenses after they have been committed," while "the police power aims to prevent them," so "the idea that the police are also *peace officers* [is not] simply a quaint anachronism"); *see also* Art. V, § 19, Fla. Const. (providing that "all judicial officers in this state shall be conservators of the peace"); *compare* § 35.26, Fla. Stat. (making the marshal and deputy marshals for the district court of appeal "conservators of the peace" where the court "is sitting"; authorizing apprehension of, "without warrant, any person disturbing the peace"; and requiring delivery of that person "to the appropriate law enforcement officer"), *with* § 25.251(3), Fla. Stat. (making the supreme court marshal and deputy marshals "law enforcement officers . . . with full powers to bear arms and make arrests"); § 379.3311(1), Fla. Stat. (constituting members of the Florida Fish and Wildlife Conservation Commission ("FWC"), its executive director, and its officers as "peace officers with the power to make arrests for violations of the law . . . committed in the presence of the officer"); § 870.04, Fla. Stat. (listing various law enforcement officers together with a mayor, city commissioner, city council member, alderman, and city police officer, as "peace officers"). Law enforcement officers typically are also peace officers, but not every peace officer is a law enforcement officer.

or statutory authority to employ or appoint such an officer); § 943.10(1), (4), Fla. Stat. (defining "law enforcement officer" as someone "elected, appointed, or employed full time by any municipality or the state or any political subdivision thereof; who is vested with authority to bear arms and make arrests" and has as his primary responsibility "the prevention and detection of crime" or enforcement of the state's "penal, criminal, traffic, or highway laws"); § 943.133, Fla. Stat. (setting out employing agency responsibilities regarding management of its law enforcement officers); § 943.135, Fla. Stat. (setting out continuing education requirements as a condition for a law enforcement officer's "continued employment or appointment" as an officer); § 943.139, Fla. Stat. (requiring an employing agency to "immediately notify" the Criminal Justice Standards and Training Commission "of the employment or appointment, or separation . . . of any" law enforcement officer); § 943.1395, Fla. Stat. (setting out certification requirements for employment or appointment of someone as a law enforcement officer); § 943.1397(1), Fla. Stat. (precluding certification of anyone as a law enforcement officer "until the person has achieved an acceptable score on the officer certification examination for the applicable criminal justice discipline").

Next, having established certification standards for law-enforcement officers, the Legislature enumerates a variety of circumstances when a "law enforcement officer may arrest a person without a warrant." § 901.15, Fla. Stat.; *see also* § 901.1505, Fla. Stat. (giving a "federal law enforcement officer" the authority to make warrantless arrests under certain circumstances, to use force when reasonably necessary, and to conduct a warrantless search incident to arrest); *cf.* § 901.151, Fla. Stat. (specifying when a law enforcement officer may "temporarily detain" someone suspected of committing or being about to commit a law violation). A law enforcement officer, together with any other peace officer, must "inform the person to be arrested of the *officer's* authority and the cause for arrest" when arresting without a warrant. § 901.17, Fla. Stat. (emphasis supplied). There is no similar

authorization or regulation for a private person to make a warrantless arrest.[10]

The Legislature also meticulously specifies who is a law enforcement or peace officer and who else has the authority to detain or arrest. *See, e.g.*, § 27.255, Fla. Stat. (declaring investigators with a state attorney's office to be both law enforcement officers and conservators of the peace, with "full powers to arrest" and to bear arms, and providing them "the same rights, protections, and immunities afforded other peace or law enforcement officers"); § 321.05, Fla. Stat. (declaring Florida Highway Patrol members as "conservators of the peace and law enforcement officers of the state, with the common-law right to arrest a person who, in the presence of the arresting officer, commits a felony" or breach of the peace; and giving them "full power to bear arms"); § 379.3311(1)–(2), Fla. Stat. (giving peace officers of FWC the power to arrest without a warrant); § 493.631, Fla. Stat. (authorizing a security officer to temporarily detain a person, until arrival of a law enforcement officer, if there is probable cause to believe the person is committing a crime against a "critical infrastructure facility," authority that terminates upon arrival of a law enforcement officer); § 648.30(3), Fla. Stat. (prohibiting anyone, "other than a certified law enforcement officer" from "apprehend[ing], detain[ing], or arrest[ing] a principal on a bond, wherever issued, unless that person is qualified, licensed, and appointed as provided in this chapter or licensed as a bail bond agent or bail bond enforcement agent"); § 810.08(2)(c), Fla. Stat. (authorizing a property owner or his designee to detain a person, until a law enforcement officer arrives, if he "reasonably believes" the person is engaged in felonious armed trespass in one of his structures or conveyances);

---

[10] *Warrantless* arrests are highlighted here because the Legislature appears to contemplate at least one situation in which an arrest warrant may issue to someone beside a peace officer to execute. *See* § 941.07, Fla. Stat. (authorizing the Governor, under the Uniform Criminal Extradition Law, to "sign a warrant of arrest" for an out-of-state fugitive that may "be directed to any peace officer or *other person* whom the Governor may think fit to entrust with the execution thereof" (emphasis supplied)).

§ 810.09(2)(b), Fla. Stat. (authorizing a property owner or his designee to detain a person he believes is engaged in felonious armed trespass until a law enforcement officer arrives); § 810.097, Fla. Stat. (authorizing the chief administrative officer of a school, or his designee, to temporarily detain a person until a law enforcement officer arrives, if there is probable cause to believe the person is trespassing on school property); § 812.015(3)(a), Fla. Stat. (authorizing "a merchant, a farmer, or a transit agency's employee or agent" to detain someone temporarily—and immediately contact a law enforcement officer—if there is probable cause to believe the person engaged in "retail theft, farm theft, transit fare evasion, or trespass"); § 870.04, Fla. Stat. (authorizing peace officers to order dispersal of riotous crowd and "to command the assistance" from others in seizing and arresting anyone who fails to comply); § 876.44, Fla. Stat. (authorizing "any peace officer or any other person employed" as a watchman or guard on a specified premises to detain for questioning and to arrest without a warrant under specified conditions); § 901.252, Fla. Stat. (allowing a municipal law enforcement officer to patrol municipal property outside city limits and to detain a person if there is probable cause to believe the person violated the law on that property); § 947.22, Fla. Stat. (providing for the authority of a parole or probation officer to arrest a parolee without a warrant); § 1012.97(2), Fla. Stat. (declaring that state university police officers are "law enforcement officers of the state and conservators of the peace" with "the right to arrest" and "full authority to bear arms in the performance of their duties").

Note that the only private persons the Legislature authorizes to detain someone without a warrant—in addition to government officers—are either those for whom the detaining would be part of their employment, or property owners where there is armed trespass. And when the Legislature does authorize a private person to temporarily detain someone as part of his employment or to stop a trespass on his property, it also typically gives immunity from criminal and civil liability for "false arrest, false imprisonment, or unlawful detention," provided the citizen complies with the statutory requirements for detention. *See, e.g.*, §§ 493.631(9), 810.08, 810.09, 810.097(3), 812.015(3)(c), Fla. Stat.

Missing from the catalog of statutes authorizing warrantless detentions and arrests, under specified procedures, is authorization for simply *any* private person to detain—without a warrant, without any procedures or restrictions, without any connection with employment or one's own property—*anyone* who commits a felony in his presence. It frankly is silly to assume the Legislature would go through all this trouble enacting statutes regulating detentions and arrests if just anyone—off his own property, off the clock, on the street—still could make his own arrest without any regulation or supervision at all. In fact, the Legislature specifies—by my count—only three other situations (beside the property owner's preventing armed trespass) in which a private person can detain or arrest independent of his employment: warrantless arrest by a "private person" upon "reasonable information" that the accused has been charged with a felony in another State (section 941.14, Florida Statutes); when directed by a peace officer to render assistance with an arrest (sections 843.06, 901.18, and 941.09, Florida Statutes); and when directed by a peace officer to assist with dispersing a riotous assembly (section 870.04, Florida Statutes). The "general and comprehensive" statutory scheme providing detailed regulations in this subject area—together with specific statutory references to warrantless arrests by private persons—highlights clear legislative intent to abrogate the common-law citizen's arrest.[11]

---

[11] The supreme court has not directly held to the contrary. The one time it did mention citizen's arrest in the last forty years, it came in the context of determining whether a search incident to an arrest by law enforcement officers—following surveillance of a possible drug offense, pursuit, and arrest outside their jurisdiction—could still be valid for evidentiary suppression purposes, even though they improperly made the arrest, ostensibly "under color of office." *See Phoenix v. State*, 455 So. 2d 1024, 1025 (Fla. 1984). The question that the court answered in the affirmative is whether the arrest by the uniformed officers could "be validated as a 'citizen's arrest'" when the arrest followed surveillance outside the officers' jurisdiction and occurred while the officers were using a "marked police car and asserted their official position in stopping the arrestees." *Id.* The court's analysis

This said, we also should not lose sight of the fact that the petitioner did not just try to arrest the victims but instead seized and held them while pointing a firearm at them. Only law enforcement and peace officers are exempt from Florida's firearm-use controls, and then only while acting "within the scope or course of their official duties or when acting at any time in the line of or performance of a duty." § 790.051, Fla. Stat.; *see also* § 790.25(2),

_____

and holding appear limited to the contours of the special status that a law enforcement officer holds—the officer seemingly being always on duty. *See* § 790.052(1)(a), Fla. Stat. (giving a law enforcement officer "the right to carry . . . concealed firearms, during off-duty hours, at the discretion of their superior officers" and allowing off-duty officers to "perform those law enforcement functions that they normally perform during duty hours, utilizing their weapons in a manner which is reasonably expected of on-duty officers in similar situations").

A law enforcement officer has extensive statutory powers of arrest, including outside his jurisdiction in certain instances. *See* § 901.15, Fla. Stat (detailing when a warrantless arrest by a law enforcement officer is lawful, but not mentioning an out-of-jurisdiction arrest as being unlawful); § 901.25(2), Fla. Stat. (authorizing arrests "outside the officer's jurisdiction when" pursuing someone he suspects to have committed a felony); *cf.* § 893.09(1), Fla. Stat. (requiring "all peace officers of the state" to enforce the Florida Comprehensive Drug Abuse Prevention and Control Act). A law enforcement officer, then, is not like a private person in this respect. The court applied the common-law, citizen's arrest principle in *Phoenix* to guard against a government officer's abusing the arrest power to conduct unreasonable searches and seizures outside the officer's jurisdiction. Allowing a law enforcement officer the common-law arrest power under certain circumstances is still *consistent* with the Legislature's overall statutory scheme in a way that allowing the same power to an untrained, unregulated private person is not. Simply put, the continued availability of the common-law citizen's arrest for private persons like the petitioner—in the face of the "general and comprehensive scheme" discussed above—was not a necessary component of the *Phoenix* decision.

Fla. Stat. (authorizing law enforcement and peace officers to "lawfully use firearms and other weapons, ammunition, and supplies for lawful purposes" while "carrying out official duties," notwithstanding general statutory restrictions on the display or use of a firearm to threaten others). Private persons, like the petitioner, are prohibited from "openly carry[ing]" a firearm, including intentionally displaying it in a "threatening manner, not in necessary self-defense." § 790.053(1), Fla. Stat.; *see also* § 790.10, Fla. Stat. (prohibiting a person with a firearm from exhibiting it in a "threatening manner" while others are present). Reinforcing the distinction between use of force in connection with arrest by a law enforcement officer and that of a private person is section 776.05, Florida Statutes. Under that provision, a "*law enforcement officer . . .* need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance." § 776.05(1), Fla. Stat. (emphasis supplied). The officer in turn "is justified in the use of any force" that he "reasonably believes to be necessary to defend himself . . . from bodily harm while making the arrest." *Id.*

Recall there are very limited circumstances where a private person—like the petitioner—has express statutory authority to make a warrantless *arrest*: when faced with an out-of-state fugitive and when under the direction of a peace officer. *See* §§ 901.18, 941.14, Fla. Stat. Section 776.05(1) reflects this statutory carve-out for authorized, warrantless arrests by private persons, allowing for the use of force *only* when the person has been "summoned or directed" by a law enforcement officer "to assist him" with the arrest. It must be, then, that a private person similarly can use deadly force to prevent an escape *only if* he is holding someone in custody at the direction of law enforcement, *not* to prevent someone from escaping from the private person's own unlawful detention. *See* § 776.07(1), Fla. Stat. (authorizing a "law enforcement officer or other person who has an arrested person in his or her custody" use any force reasonably believed to be necessary to prevent escape).

Here, the petitioner did not just act without direction from a law enforcement officer—but instead acted directly *contrary* to an officer's clear instruction: to wait and do nothing until law enforcement was on the scene. The petitioner chose to go at it

alone, recklessly and unlawfully, creating a highly dangerous situation that easily could have ended with a tragic outcome for one of the victims or the petitioner. The petitioner cannot conduct an unauthorized arrest, while using the threat of deadly force, and claim immunity from prosecution for the unfortunate consequences that ensue. There being no clear case of immunity here, no basis exists to grant the extraordinary relief requested. I join the denial of the petition.

_____

Elizabeth L. White, Matthew R. Kachergus, Bryan E. DeMaggio, and Camille E. Sheppard of Sheppard, White, Kachergus & DeMaggio, P.A., Jacksonville, for Petitioner.

James Uthmeier, Attorney General, and Michael Schaub, Assistant Attorney General, Tallahassee, for Respondent.